

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
————————————————X
Mohammed Saleh, Plaintiff,
       -against-
The United States of America, Warden K. Heckard,
Chaplain Weaver, Lt. Spradlin, Ms. E. Stennett,
Counselor T. Milam, Officer Fernett, Officer A. Ross,
Unicor Factory Manager Ms. S. Phipps,
Physician's Assistant Brian Jarrel, Doctor Rickey Bradley,
Doctor Roger Edwards, Administrator of Health Services
Melissa Fox and Jane Doe Medical Professional, Defendants.
————————————————X

Case # 5:24-cv-00294

## COMPLAINT
## JURY TRIAL DEMANDED

### PRELIMINARY STATEMENT

1. Plaintiff Mohammed Saleh comes, pro se, former inmate FCI Beckley, submitting this Bivens action and tort claim under the Federal Tort Claims Act (FTCA) regarding violations of his rights from the following Defendants acting in their individual capacity as officers at Federal Bureau of Prisons, Beckley, WV under the Federal Bureau of Prisons.

2. Plaintiff seeks $6,500,000 in damages, and any other and further relief as the court may deem just and proper.

### JURISDICTION

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that this is a civil action arising under FTCA and under the case known as Bivens. Portions of this document were prepared with the assistance of the NYLAG Clinic for Pro Se Litigants.

### VENUE

4. Venue is proper in this district under 28 U.S.C. §1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim that occurred in this district.

### FACTS

I. The Cruelty and Harassment of Chaplain Weaver.

5. On or around June 2016, I arrived at Federal Bureau of Prisons, Beckley, WV. FBOP Beckley is a federal prison operated by the Bureau of Prisons (BOP).

6. My arrival coincided with the holy month of Ramadan. I am an observant Muslim, and I had already started fasting.

7.  According to the instructions of the Prophet Mohammed which are essential to my religious tradition, it is recommend to break the Ramadan fast with dates or dried fruit.

8.  For this reason, I checked the commissary list to see if there were any of those items available. Seeing that none were, I asked the commissary officer if there was a way to get these items. The commissary officer told me to check with the Chaplain.

9. I went to Chaplain Weaver, the supervisory Chaplin, and asked him if he could request that the commissary sell dates and dried fruit as other correctional institutions do.

10. Chaplain Weaver became visibly angry.  He told me, "I know who you are. If you file or complain or ask other inmates to file, I will lock you up. I am not going to order dates, you understand."

11. This was my first encounter with Chaplain Weaver.  The Chaplain violated my First Amendment right and the Religious Land Use and Institutionalized Persons Act (RLUIPA) by not following the directions of BOP policies, and violations of my right to practice my religion occurred between 2017 and 2023.

My subsequent encounters with Chaplain Weaver:

12. During this period, he frequently cancelled Friday services for me and for other Muslims at Beckley.

13. According to the Quran, Friday services are commanded by God, and Muslims must not miss them without any justification.

14. Missing these services caused me great distress. I was—and continue to be—filled with anxiety, depression and anger that I could not fulfill my religious obligations.

15. For this reason, I, along with a few other inmates, went to complain to the Lieutenants Office.

16. The Lieutenants Office sent an officer to the chapel and opened it, allowing Muslims to have Friday services. The Lieutenants Office did this several more times when Chaplain Weaver prevented us from going to Friday services.

17. Eventually the operation Lieutenant told me and other Muslim inmates that he was getting tired of the complaints against Chaplain Weaver. He went on to say that Chaplain Weaver was supposed to make arrangements so that Muslim inmates could attend services.

18. Chaplain Weaver called me to his office. He was very mad and used abusive language and threatened to lock me up in solitary confinement.

19. Later, several other staff members came to me and said that Chaplain Weaver had instructed them to lock me up in solitary confinement. They asked me what I did.  I said that I hadn't done anything. They told me that they told Chaplain Weaver that he couldn't put me in solitary confinement without any justification.

2

20. Sometimes Chaplain Weaver cancelled the Friday services for weeks without any justification. Chaplain Weaver told Muslim inmates that Muslims worship the devil.

21. At some point in August 2017, I requested religious books from the bookstore. The books arrived to SIS Sweeney. He inspected the books and gave them to Chaplain Weaver to give to me, but Chaplain Weaver denied receiving them. Mr. Sweeney walked with me to Mr. Weaver's office and told Chaplain Weaver that he had placed the books directly into Chaplain Weaver's hands.

22. Chaplain Weaver never returned the books to the bookstore or gave me a reason why I couldn't have the books. I never received any rejection notice. According to BOP policy, if Chaplain Weaver rejected the books I was entitled to receive a rejection notice.

23. Around December 2021 I went to Chaplain Weaver to sign up for Halal meals. He denied that Halal meals existed in BOP which I knew to be false. My lawyer had told me Halal meals are available in many other prisons.

24. Chaplain Weaver told me he would sign me up for the common fare meal option. I agreed, and he placed me on common fare. A few months later I was removed from the common fare diet without any notice.

25. After I asked Mr. Weaver why I was removed from common fare, he canceled Friday services.

26. After this happened, I went to AW Rich and told him I was removed from the common fare without any notice. According to the policy statement, removal must be accompanied with notice explaining the reason for the removal. After I showed AW Rich the policy statement, he forced Chaplain Weaver to place me back on common fare. All these actions of chaplain Weaver are violation of RLUIPA.

II.  Lieutenant Spradlin's Intimidation and Sexual Harassment.

27. Lt. Spradlin frequently intimidated and harassed me by using abusive language in violation of BOP regulations for staff conduct, and violations of my Eighth Amendment rights against cruel and unusual punishment.

28. Around May, 2022, I was leaving the yard wearing shorts and a T-shirt. I was approached by Officer Stennett, who told me Lt. Spradlin wanted to talk to me.

29. Officer Stennett escorted me to the Lieutenants Office. Lt. Spradlin came out of the office smiling and told Officer Sennett to take me to the bathroom and strip me, "butt naked."

30. Officer Stennett escorted me to bathroom and said, "I don't know what's going on between you and Lt. Spradlin." He ordered me to strip. I followed the order.

31. Officer Stennett told me to wait until he checked with Lt. Spradlin. After waiting naked for at least half an hour, I was told by Officer Stennett to go back to my unit.

32. Around March 2023 I was coming out from the dining hall. Lt. Spradlin was standing with other staff in an area outside known as Times Square. He called out to me and asked about my cane. He said,

3

"motherfucker, what, you get explosives with you and you using the cane as a detonator."

33. SIS Sweeney was one of the staff members present. I said to him, I know you heard that. He shook his head. The next day I went to AW Rich and Warden Heckard. I complained about Lt. Spradlin's harassment and unprofessional conduct, and I filed a grievance.

III.  The Denial of Grievances and Destruction of Property by Ms. Stennett and Mr. Milam.

Intimidation and Harassment for Using My Rights of Filing Grievances:

34. Despite my efforts to remedy the issues I faced, I was often denied the opportunity to do so through the administrative process.

35. Ms. Stennett is the Unit Manager, and Mr. Milam is the Counselor who works under her supervision.

36. Between 2020 and 2023 they repeatedly prevented me from filing grievances when I attempted to seek relief through pursuing administrative remedies.

37. This occurred on at least ten occasions.

38.  In or around July 2023, I complained to Ms. Stennett about not receiving any responses regarding my grievances. I also complained that Mr. Milam refused to issue any new grievances that I requested. Ms. Stennett said she would check on it.

39. That same day Mr. Milam came down see me, trashed my cell, and broke a milk carton on top of my clothes and books and stepped on my holy book, the Quran, in violation of BOP policies regarding staff conduct.

IV.  The Desecration of the Quran by Officer Fernett.

40. Officer Fernett frequently hassled Muslim inmates and told them he killed Muslims like flies when he was in in Iraq.

41. In or around May 2019, I requested a holy Quran from Islamic bookstore. It came sealed from the bookstore and arrived in the FCI mailroom.  CO Fernett and another officer worked there.

42. Officer Fernett opened the holy Quran and used his marker to write insults inside of it. He wrote "Allah loves the cock," "I love pig balls," and "Your virgins are little boys." Officer Fernett violated my First Amendment right and RLUIPA.

43. After this happened, I went to the Warden and his Captain and Lt. Winbush. They told me they would open an investigation.

44. I knew Officer Fernett was the one who did this because he frequently read through my legal mail, while the other officer in the mailroom never did. Even SIS Lt. Day told me he knew that Officer

4

Fernett did it, but that there would be no way to prove it because there is no camera in the mailroom.

V.  The Cruelty and Harassment of Officer Ross Violated My Eighth Amendment Rights and Code Conduct of BOP.

45. For the first few months after I arrived at FBOP Beckley in June 2016, CO Ross was working from midnight to 7:30 AM. Beckley had three counts at night: 12AM, 3AM, 5AM.

Harassment and unusual punishment:

46. CO Ross used to disturb my sleep in any way he could. Depending on who was working with him, he would take various measures to harass me. If he was working with an officer he trusted, he would bang on my cell door very hard to keep me from sleeping.

47. If he didn't trust the officer he was with, he would shine his flashlight on my face, even if I tried to move my face away, and would laugh at me because I could not sleep.

48. I filed grievances because of this but nothing came of them. He continued this for two years. The banging on my cell door got worse and worse.

49. For this reason, I approached Lt. Winbush. She told me she would review the camera footage and if she saw Officer Ross doing what I said, she would take action.

50.  I saw Lt. Winbush a week later. She told me I was right, and that she saw him banging on my door, and she removed him to a different post.

51.  Around June 2018, Officer Ross came back to pass out breakfast with another officer.  He instructed that officer to give me pork since he knew I was a Muslim. I filed a grievance, but he denied everything.  He violated my First Amendment rights and RLUIPA.

52. While he was working in his new post, from around 2019 to 2022, he would call my wife and my daughter in the middle of the night while they were sleeping and make scary sounds just to terrify them and disturb their sleep.

Intimidation and harassment of my family:

53. This happened many times. The calls were recorded in the log of my wife's phone.

54. I went to Lt. Winbush, and she told me it was Officer Ross. She called him to her office, and he stopped, but only two years before my release.

Sexual Harassment, Violations of BOP Policy and the Code of Conduct:

55. In addition, when Officer Ross saw me in the compound, he would frequently call me over to be pat down, and in doing so would purposefully grope my genitals.

5

56. This occurred at least five times. I never did anything to instigate this behavior. This happened between 2022–2023.

57. I was denied employment in Unicor on the basis race and religion by the factory manager of Unicor Ms. Phipps in violation of BOP policies and due process of the Fourth Amendment.

VI.  The Denial of Medical Care by PA Jarrel and Dr. Bradley for Eighth Amendment Violation of Ineffective Medical Assistance for Both the Eye and Knee Injuries.

A. The Denial of Necessary Knee Surgery:

58. On around February 2022 Dr. Holen performed surgery on my knee for a bone growth. A week after surgery I complained to RN Thompson and PA Jarrel that I had severe pain and swelling. They both told me that this was normal, and that I would be ok and that my knee was healing.

59. On March 14, 2022 I went to medical again and saw PA Hutchinson. He examined my knee and told me I had a severe infection for which he prescribed antibiotics. These helped reduce the pain and the swelling.

60. A month later I was still experiencing pain and swelling. I saw Dr. Holen the surgeon. He ordered an ultrasound. After a couple of months, I got one.

61. After receiving the ultrasound results on May 9, 2022 Dr. Holen recommended that I get an MRI. I waited another five months for an MRI. The results revealed a partial tear in the tendon.

62. In light of these results, on December 8, 2022 Dr. Holen saw me in the clinic and after reviewing the MRI report asked me if I wanted him to reopen my knee and fix it now or try new pain medication for a month, and decide then if I still wanted him to reopen it. I said I would wait a month.

63. When one month had passed, around end of January 2023, I asked PA Jarrel and Dr. Bradley to see Dr. Holen to request redoing the surgery since I still having severe pain. They both told me I could not see Dr. Holen again, at all.

64. After they denied me the opportunity, I complained frequently. I went to the clinic at least ten times to explain that there was something seriously wrong with my knee and that I needed care. I spoke to Ms. Fox the clinic supervisor and I filed remedy.

65. Even so, they denied me treatment and because of this I have experienced severe pain and swelling that persists to this day. I have to walk with a cane, and it is very hard for me to sleep at night. This conduct from the staff was deliberate indifference to my serious medical needs.

B. The Denial of Necessary Treatment for an Eye Stroke by Dr. Jane Doe:

66. On or around September 2018 I saw the eye doctor, Dr. Carpenter. He examined my eyes and recommended a retinal consult next available for my left eye.

6

67. He told me to be careful, and if I saw any signs of flashing and redness to come in immediately so that I could be taken to an outside clinic.

68. He documented all of this in my medical record.

69. Dr. Edwards, who ran the clinic, was aware that I had this medical issue, as was the administrator of health services (AHS) Ms. Fox. They scheduled me almost a year later on August 11, 2019.

70. On or around January 2022, I experienced flashes and redness in my eye. I went running to medical. RN Paula Casto was in the triage room.

71. I explained my symptoms and what the prior doctor had told me about my eye.

72. RN Casto saw my eye and called another woman (Jane Doe Medical Professional) who I believe was a doctor, for her opinion.

73. Once again, I explained my symptoms to Jane Doe Medical Professional, along with what Dr. Carpenter had told me.

74. Jane Doe Medical Professional looked at my left eye without performing an examination and told me that it was ok. She said I would be put on a list to see the eye doctor.

75. After I was put on the waiting list, I went more than five times to the clinic to explain the severity of my situation, and to ask to see the eye doctor, but they said I had to wait.

76. After a few months, I saw the eye doctor. This eye doctor referred me to see a specialist, then another specialist, Dr. Hunt, who told me that I had a stroke in my left eye. This second specialist said, "Nobody told you?" When I said no, she was shocked.

77. I lost half of my eyesight in my left eye. I suffer severe pain. I had to receive more than seventeen injections already. If I don't continue to receive injections, I will lose my eyesight completely.

RELIEF SOUGHT FIRST CLAIM FOR RELIEF: INTENTIONAL INFLICTION
OF EMOTIONAL DISTRESS
West Virginia Common Law/Federal Tort Claims Act
(As against the United States of America for the actions of Chaplain Weaver)

78. Mohammed Saleh repeats and realleges by reference herein all allegations set forth above.

79. The government's agent, Chaplain Weaver, acting within the scope of his employment, had an intent to cause, or a disregard of a substantial probability of causing, severe emotional distress.

80. There was a causal connection between the conduct and the injury.

81. The conduct proximately caused the victim to suffer severe emotional distress.

82. The United States Government is liable for all damages caused by such acts, as provided by 28 U.S.C. §1346(b)(1).

7

SECOND CLAIM FOR RELIEF: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
West Virginia Common Law/Federal Tort Claims Act
(As against the United States of America for the actions of Lieutenant Spradlin)

83. Mohammed Saleh repeats and realleges by reference herein all allegations set forth above.

84. The government's agent, Lieutenant Spradlin, acting within the scope of his employment, had an intent to cause, or a disregard of a substantial probability of causing, severe emotional distress.

85. There was a causal connection between the conduct and the injury.

86. The conduct proximately caused the victim to suffer severe emotional distress.

87. The United States Government is liable for all damages caused by such acts, as provided by 28 U.S.C. §1346(b)(1).

THIRD CLAIM FOR RELIEF: TRESPASS TO CHATTELS
West Virginia Common Law/Federal Tort Claims Act
(As against the United States of America for the actions of Ms. Stennett and Mr. Milam)

88. Mohammed Saleh repeats and realleges by reference herein all allegations set forth above.

89. The government's agents, Ms. Stennett and Mr. Milam, acting within the scope of their employment, intentionally and without justification or consent, physically interfered with the use and enjoyment of personal property in the Plaintiff's possession.

90. This interference caused the victim harm.

91. The United States Government is liable for all damages caused by such acts, as provided by 28 U.S.C. §1346(b)(1).

FOURTH CLAIM FOR RELIEF: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
West Virginia Common Law/Federal Tort Claims Act
(As against the United States of America for the actions of Ms. Stennett and Mr. Milam)

92. Mohammed Saleh repeats and realleges by reference herein all allegations set forth above.

93. The government's agents, Ms. Stennett and Mr. Milam, acting within the scope of their employment, had an intent to cause, or a disregard of a substantial probability of causing, severe emotional distress.

94. There was a causal connection between the conduct and the injury.

95. The conduct proximately caused the victim to suffer severe emotional distress.

96. The United States Government is liable for all damages caused by such acts, as provided by 28 U.S.C. §1346(b)(1).

8

FIFTH CLAIM FOR RELIEF: TRESPASS TO CHATTELS
West Virginia Common Law/Federal Tort Claims Act
(As against the United States of America for the actions of Officer Fernett)

97. Mohammed Saleh repeats and realleges by reference herein all allegations set forth above.

98. The government's agent, Officer Fernett, acting within the scope of his employment, intentionally, and without justification or consent, physically interfered with use and enjoyment of personal property in the Plaintiff's possession.

99. This interference caused the victim harm.

100. The United States Government is liable for all damages caused by such acts, as provided by 28 U.S.C. §1346(b)(1).

SIXTH CLAIM FOR RELIEF: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
West Virginia Common Law/Federal Tort Claims Act
(As against the United States of America for the actions of Officer Fernett)

101. Mohammed Saleh repeats and realleges by reference herein all allegations set forth above.

102. The government's agent, Officer Fernett, acting within the scope of his employment, had an intent to cause, or a disregard of a substantial probability of causing, severe emotional distress.

103.  There was a causal connection between the conduct and the injury.

104. The conduct proximately caused the victim to suffer severe emotional distress.

105. The United States Government is liable for all damages caused by such acts, as provided by 28 U.S.C. §1346(b)(1).101. Mohammed Saleh repeats and realleges by reference herein all allegations set forth above.

SEVENTH CLAIM FOR RELIEF: INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS
West Virginia Common Law/Federal Tort Claims Act
(As against the United States of America for the actions of Officer Ross)

106. Mohammed Saleh repeats and realleges by reference herein all allegations set forth above.

107. The government's agent, Officer Ross, acting within the scope of his employment, had an intent to cause, or a disregard of a substantial probability of causing, severe emotional distress.

108. There was a causal connection between the conduct and the injury.

109. The conduct proximately caused the victim to suffer severe emotional distress.

110. The United States Government is liable for all damages caused by such acts, as provided by 28 U.S.C. §1346(b)(1).

## EIGHTH CLAIM FOR RELIEF: SEXUAL BATTERY
West Virginia Common Law/Federal Tort Claims Act
(As against the United States of America for the actions of Officer Ross)

111. Mohammed Saleh repeats and realleges by reference herein all allegations set forth above.

112. The government's agent, Officer Ross, inflicted unpermitted, harmful and offensive sexual contact upon the person of the Plaintiff.

113. As a direct and proximate result of this contact, Plaintiff sustained physical, emotional and psychological injuries, along with pain and suffering.

114. The United States Government is liable for all damages caused by such acts, as provided by 28 U.S.C. §1346(b)(1).

## NINTH CLAIM FOR RELIEF: VIOLATION OF PLAINTIFF'S RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT
Eighth Amendment, Bivens
(As against Warden K. Heckard, Physician's Assistant Jarrel, and Doctor Bradley)

115. Mohammed Saleh repeats and realleges by reference herein all allegations set forth above.

116. Plaintiff had an objective medical need that required care.

117. Defendants knew of this need, as well as the excessive risk of serious harm that could result if Plaintiff's medical condition went untreated.

118. Defendants acted with deliberate indifference by disregarding this excessive risk and denying Plaintiff's repeated requests for medical care.

119. As a result of Defendants' conduct, Plaintiff suffered extreme emotional harm, physical injury and loss of enjoyment of life.

120. Defendants' conduct was intentional, wanton, willful and/or outrageous, entitling Plaintiff to an award of punitive damages.

121. The conduct of all Defendants was accomplished under color of law and deprived Plaintiff of rights, privileges, or immunities secured by the Eighth Amendment to the U.S. Constitution.

## TENTH CLAIM FOR RELIEF: VIOLATION OF PLAINTIFF'S RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT
Eighth Amendment, Bivens and according to the FTCA and USA
(As against Warden K. Heckard, Dr. Edwards, AHS Fox and Jane Doe Medical Professional)

122. Mohammed Saleh repeats and realleges by reference herein all allegations set forth above.

123. Plaintiff had an objective medical need that required care.

10

124. Defendants knew of this need, as well as the excessive risk of serious harm that could result if Plaintiff's medical condition went untreated.

125. Defendants acted with deliberate indifference to by disregarding this excessive risk and denying Plaintiff's repeated requests for medical care.

126. As a result of Defendants' conduct, Plaintiff suffered extreme emotional harm, physical injury and loss of enjoyment of life.

127. Defendants' conduct was intentional, wanton, willful and/or outrageous, entitling Plaintiff to an award of punitive damages.

128. The conduct of all Defendants was accomplished under color of law and deprived Plaintiff of rights, privileges or immunities secured by the Eighth Amendment to the U.S. Constitution.

ELEVENTH CLAIM FOR RELIEF: VIOLATION OF PLAINTIFF'S RIGHT TO FREE EXERCISE OF RELIGION
First Amendment, Bivens/Religious Land Use and Institutionalized Persons Act (RLUIPA)
(As against Chaplain Weaver)

129. Mohammed Saleh repeats and realleges by reference herein all allegations set forth above.

130. Plaintiff had a sincerely held religious belief.

131. Defendant substantially burdened the exercise of his religion.

132. Defendant's actions which burdened the exercise were not reasonably related to a legitimate penological interest.

133. As a result of Defendant's conduct, Plaintiff suffered emotional harm.

134. Defendant's conduct was intentional, wanton, willful and/or outrageous, entitling Plaintiff to an award of punitive damages.

135. The conduct of Defendant was accomplished under color of law and deprived Plaintiff of rights, privileges or immunities secured by the First Amendment to the U.S. Constitution.

TWELFTH CLAIM FOR RELIEF: RETALIATION
First Amendment, Bivens/Religious Land Use and institutionalized Persons Act (RLUIPA)
(As against Ms. Stennett and Mr. Milam)

136. Mohammed Saleh repeats and realleges by reference herein all allegations set forth above.

137. Plaintiff engaged in protected speech by filing or attempting to file prison grievances.

138. Because of Plaintiff's attempts to exercise his protected speech, Defendants trashed Plaintiff's cell, broke a milk carton on top of his clothes and books and stepped on his holy book, the Quran.

11

139. As a result of Defendants' conduct, Plaintiff suffered emotional harm.

140. Defendants' conduct was intentional, wanton, willful and/or outrageous, entitling Plaintiff to an award of punitive damages.

141. The conduct of all Defendants was accomplished under color of law and deprived Plaintiff of rights, privileges or immunities secured by the First Amendment to the U.S. Constitution.

WHEREFORE, Mohammed Saleh requests judgment as follows:

By reason of the foregoing, and because of the violations of my constitutional rights and the tortious injuries I have suffered—as well as any other claims for relief that the Court may construe from this Complaint, given that I am a pro se litigant—I am entitled to be paid $6.5 million in money damages from Defendants for pain, suffering, punitive damages and such other and further relief as the Court deems just and proper.

Dated:  August 5, 2024

Respectfully submitted,

MOHAMMED SALEH
c/o C. Dudek
417 East 9th Street, #16
New York, New York 10009
212-982-1244

Mohammed.1956s@yahoo.com

12